**FILED**
**Aug 29, 2023**
**07:00 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT COOKEVILLE

| | | |
|---|---|---|
| **JAMES LEE STEELE,** | ) | **Docket No 2021-04-0251** |
| **Conservator for Christopher L.** | ) | |
| **Mason, Employee,** | ) | |
| **v.** | ) | |
| **SUMMIT CONSTRUCTORS, INC.** | ) | **State File No. 68572-2020** |
| **Employer,** | ) | |
| **And** | ) | |
| **BERKLEY CAS. CO.,** | ) | |
| **Carrier.** | ) | **Judge Robert Durham** |

---

## COMPENSATION ORDER GRANTING BENEFITS

---

The Court held a Compensation Hearing on August 14, 2023, to determine whether Mr. Mason's dementia primarily arose out of his work-related accident and the extent of his vocational disability from his injury.[1]  The Court holds that Mr. Mason proved he is permanently and totally disabled from his ankle injury but did not prove his dementia primarily arose from his accident.

### History of Claim

Mr. Mason, a heavy equipment mechanic, flipped his car at work on October 15, 2020, severely breaking his right ankle.[2]  At the emergency room, he reported that he thought he fell asleep before driving off the road.[3]  He denied any injury other than his

---

[1] A neurologist deemed Mr. Mason incompetent to testify, so he did not attend the hearing.

[2] The parties stipulated that Mr. Mason's car accident occurred in the course and scope of employment and that Mr. Mason's ankle fracture arose primarily from this accident.  They also agreed that Mr. Mason reached maximum medical improvement on January 11, 2022, his compensation rate is $994.00, his permanent partial disability benefits began to accrue on March 14, 2022, and his date of birth is April 9, 1962.

[3] The parties submitted an "Agreed Medical Records Exhibit" and stipulated to the admissibility of the records.

1

ankle fracture. X-rays showed a comminuted and severely displaced tibia/fibula fracture. A head CT scan did not show an acute injury but did reveal some "white matter disease" consistent with age.

The next day, Mr. Mason seemed "very drowsy" and had difficulty giving his history. Hospital notes described him as "disoriented and confused." The notes also recorded that Mr. Mason suffered from preexisting swelling and cellulitis in his legs and had been diagnosed with deep venous thrombosis the previous April.

Dr. Geoffrey Watson, an orthopedist specializing in foot and ankle injuries, saw Mr. Mason at the emergency room. Mr. Mason told him that he fell asleep at the wheel. Dr. Watson observed that Mr. Mason had both broken and dislocated his right ankle, which he attributed to the accident. He also noted redness and cellulitis in both legs that Mr. Mason related to a tree falling on him several months before.

The cellulitis affected Mr. Mason's treatment. Instead of an internal fixation, Dr. Watson decided to use an external fixator instead. When asked if an internal fixation would have produced a better outcome, Dr. Watson said it was hard to predict, but "typically, yes."

Two days after his accident, Mr. Mason gave a statement to Summit's adjuster. He told the adjuster that he remembered "every bit" of the accident. He said he "wasn't confused. . . . I remember the whole wreck and everything that happened." He further answered "no" when asked whether he injured his head in the accident, and he did not list his head or neck as injured body parts.

Mr. Mason's recovery was complicated by contracting COVID, developing an infection, and DVT. Dr. Watson did not remove the fixator until mid-December. When he met with Mr. Mason to discuss removing the hardware, he noted that Mr. Mason fully understood and wished to have the surgery. The record did not mention any mental deficits or problems. Dr. Watson's physician's assistant also saw Mr. Mason in January, February, and March of 2021 to monitor his progress from the hardware removal. The records did not mention any problems with memory loss or cognitive function.

Dr. Watson said that the dislocation made the injury worse because Mr. Mason quickly developed traumatic arthritis. This was due to the stress being placed on the cartilage, which made it more painful and difficult for Mr. Mason to bear weight on his ankle.

Mr. Mason saw Dr. Watson again in May 2021. He did not document Mr. Mason's range of motion but observed that he needed a cane to walk due to arthritis. He believed the arthritis was primarily caused by the fracture. Dr. Watson wanted Mr. Mason to consider a fusion to relieve pain. He also noted that Mr. Mason was exhibiting "slight

2

confusion," had trouble sleeping, and was scheduled to see a neurologist. He recommended that Mr. Mason undergo the neurological evaluation and be seen by a vascular surgeon for his DVT before the fusion. However, Mr. Mason never underwent the fusion.

Dr. Watson rated Mr. Mason's impairment under Table 16-2 of the American Medical Association Guides. He placed Mr. Mason in Class 2 for moderate malalignment, which equals 10 percent impairment. While Dr. Watson did not specifically measure loss of motion, he recalled that Mr. Mason had "relatively limited range of motion" based on his difficulty in walking, which justified the Grade 2 rating.

He also gave restrictions against lifting twenty pounds and said Mr. Mason should stand for less than one-third of his workday. He additionally signed a C-42 certifying that Mr. Mason is no longer able to perform his pre-injury occupation due to his permanent restrictions. This remains his opinion.

On cross-examination, Dr. Watson said he could not recall whether Mr. Mason told him he hit his head during the accident, but he did not see any neurocognitive deficiencies at the time of his initial treatment.

At Summit's request, physiatrist Jeffery Hazlewood, M.D. reviewed Mr. Mason's records to provide an impairment for the fractured ankle. Dr. Hazlewood felt hampered in assessing impairment because he did not personally examine Mr. Mason, and Dr. Watson did not measure range of motion. Without that, the best Dr. Hazlewood could do was estimate an impairment of five to nine percent, although he agreed it could be ten percent. He believed that the cellulitis and DVT, which he felt were non-work related, made the prognosis for a successful fusion "very guarded."

Mr. Mason also underwent an impairment evaluation through the Medical Impairment Rating Registry with orthopedist Robert Landsberg, M.D. Dr. Landsberg examined Mr. Mason, reviewed records, and took repeated ankle range of motion measurements. Based on his exam and review, he placed Mr. Mason in Class Three of Table 16-2 and assigned a ten-percent impairment.

Both parties also used experts to testify as to Mr. Mason's vocational disability from his ankle injury. Michael Galloway testified on Mr. Mason's behalf, and Michelle Weiss testified for Summit. Their methods and conclusions were quite similar.

Neither gave any vocational tests due to Mr. Mason's mental deficiencies, and neither assessed vocational disability for these deficiencies. Both used Dr. Watson's restrictions for the ankle fracture and resulting arthritis. They agreed that with those restrictions; Mr. Mason fell in the "light" category for work activities and could only perform sedentary, unskilled labor for which very few jobs are available within his job

market. Both experts agreed that Mr. Mason was totally disabled from working.

In addition to the ankle injury, Mr. Mason also submitted considerable lay evidence regarding Mr. Mason's cognitive abilities.

Mr. Mason's sister, Lesa DeLong, said that before his accident, her brother was one of the hardest-working people she knew. His job history was primarily as a mechanic, but he also had a cattle farm, which he managed alone. Before the injury, he was talkative and enjoyed visiting their parents on the weekends. The last time Ms. DeLong saw him before the accident was the first of September. She saw no memory difficulties or cognitive deficits before the accident.

Due to COVID, Ms. DeLong only saw her brother once about two and a half weeks after the accident for only fifteen or twenty minutes. Other times, she briefly visited him through a window. She did not observe any mental problems while he was in the hospital.

Ms. DeLong said that after being released in November, Mr. Mason stayed with his parents, sold his farm, and made several large purchases, including a home and a new truck. He also began giving away large sums of money to his church and a friend. In January, Ms. Delong began noticing a decline in Mr. Mason's memory. She asked if he hit his head in the accident, and he could not remember. He began repeating questions, frequently lost things, and would become confused over whether it was day or night. In May, his family physician referred him for a neuropsychological consult.[4]

Over the next several months, Mr. Mason's behavior became increasingly erratic. In June 2022, the family's concerns grew so great that they moved him into a home next to his mother's. Shortly afterward, Mr. Mason roamed unclothed through the neighborhood. His neighbors called the police, and he was admitted to a hospital. His family then decided assisted living would be the best option for his continued care, and his brother, James Steele, was appointed conservator.

Ms. Delong felt that Mr. Mason's memory problems are worsening. She said she did not believe that he can ever work again as a mechanic.

Mr. Steele's testimony was consistent with Ms. DeLong's. Before the accident, he saw his brother once every week to two weeks at their parents' home, and he did not notice any memory problems. Like his sister, he did not know if Mr. Mason hit his head in the accident. He is currently managing his brother's finances, and Mr. Mason still has considerable assets.

Mr. Mason also submitted the deposition of Dr. Jesse Kellum, a board-certified

---

[4] The parties did not make his family doctor's records an exhibit.

4

neurologist in practice for forty years. He treated Mr. Mason's memory loss. He testified that all his treatment was reasonable and necessary, as was Mr. Mason's residence in assisted living.

Dr. Kellum first saw Mr. Mason in August 2021. He observed significant memory deficits and recommended more in-depth neuropsychologic testing. Later, he reviewed a brain MRI that showed some changes consistent with aging. Mr. Mason's exam was unchanged from his previous visit. Dr. Kellum attributed Mr. Mason's memory disturbance primarily to his October 2020 car accident.

Over the next several months, Dr. Kellum noted continued memory loss as well as impaired cognitive function, including an inability to appropriately respond to commands. Dr. Kellum noted an episode in June where Mr. Mason was hospitalized and diagnosed with alcohol-induced delirium after wandering around his neighborhood naked.

Dr. Kellum ordered an EEG, which was normal and ruled out seizure activity. He also ordered neuropsychological testing by psychologist Dr. Scott Foster. Dr. Foster felt that while it was possible Mr. Mason hit his head during his accident, the "extent and severity of the patient's memory and cognitive functioning are beyond what would typically be expected with a head injury." He also observed that Mr. Mason's sleep apnea, medication, and alcohol abuse could also be contributing to his cognitive impairment, and his condition was "likely multifactorial."

After Dr. Foster's testing, Dr. Kellum diagnosed Mr. Mason with traumatic brain injury, ethanol-related dementia, sleep apnea, and insomnia. However, he still believed the accident was the primary cause of Mr. Mason's dementia because Mr. Mason was working and functioning normally before the accident. Now he is not.

Dr. Kellum anticipated that Mr. Mason's mental condition will not improve and he will continue to require treatment. From a neurological standpoint, he felt Mr. Mason would probably be precluded from any type of work unless it was perhaps "very menial."

On cross-examination, Dr. Kellum admitted that Mr. Mason's records showed he did not lose consciousness or hit his head in the accident. But he argued that head trauma can result without doing so. He said his causation opinion was due to the lack of symptoms before the accident; however, he conceded this was based solely on what Mr. Mason's siblings told him and that Mr. Mason was working as a mechanic.

Dr. Kellum acknowledged Dr. Foster's opinion that Mr. Mason's mental impairment was likely multi-factorial. He said he would defer to Dr. Foster's opinion, since his own evaluation was several years after the accident. He further agreed that Mr. Mason's mental condition "really got bad" when he was hospitalized for the diagnosed alcohol-related delirium. Still, he believed that the trauma from the accident was the most

5

important factor in Mr. Mason's mental decline, although he conceded this opinion was speculation.

To counter Dr. Kellum's testimony, Summit offered the deposition of neurologist Subir Prasad, M.D. Based on his evaluation and record review, Dr. Prasad diagnosed Mr. Mason with dementia. However, he found nothing to suggest the symptoms were primarily related to his accident. He concluded that at least fifty percent of Mr. Mason's dementia was due to non-work-related conditions.

On cross-examination, Dr. Prasad acknowledged that although Mr. Mason's siblings said he was fine before his accident, and he was able to work a demanding job before his accident, he could still have been suffering from some early signs of dementia. He said he would have to interview Mr. Mason's co-workers to see if they saw any problems.

Dr. Prasad said if someone experienced memory loss after an accident with no head trauma, it would most likely be due to an emotional disturbance caused by the accident. However, an emotional disturbance would not explain the level of Mr. Mason's dementia. He admitted that he did not know what caused Mr. Mason's dementia, but it was most likely multi-factorial.

## Findings of Fact and Conclusions of Law

Mr. Mason has the burden of proving the essential elements of his workers' compensation claim by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6) (2022). However, in this case, the parties have stipulated to all issues except the extent of Mr. Mason's permanent disability and whether his current mental problems arise primarily out of and in the course and scope of his work-related accident. Each will be addressed in turn.

### *Anatomic Impairment*

Dr. Watson, the authorized physician, assigned a ten-percent rating. He primarily based it on the loss of range of motion that he observed, even though he did not perform range-of-motion testing. Dr. Hazlewood only reviewed the records and likewise did not perform motion testing. Since he had no record of motion loss, Dr. Hazlewood only felt comfortable giving a range of six to nine percent impairment. However, Dr. Landsberg, the MIRR panel doctor repeatedly tested range of motion. Based on the results, he assigned a ten-percent rating.

A MIRR panel doctor's impairment rating is presumed correct, and the presumption may only be overcome by clear and convincing evidence. Tenn. Code Ann. § 50-6-204(d)(4). The Tennessee Supreme Court has defined "clear and convincing evidence" to

6

mean "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from [it]." *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 411 (Tenn. 2013).

Here, only Dr. Hazlewood gave a contrary opinion to Dr. Landsberg's, and he conveyed it as a speculative range. A speculative opinion is insufficient to overcome the presumption attached to Landsberg's opinion. Thus, the Court holds that Mr. Mason's ankle injury impairment is ten percent.

Ultimately, however, the degree of anatomic impairment is not a significant issue if the injury has made Mr. Mason totally disabled. The Court holds that to be the case.

*Permanent Total Disability*

Tennessee Code Annotated section 50-6-207(4)(B) provides that employees who suffer an injury that "totally incapacitates [them] from working at an occupation that brings [them] an income" shall be considered totally disabled. The burden is on the employee seeking permanent total disability benefits to establish that he is unable to work at any job that would produce an income in the open labor market. *Stocklin v. Barrett Dist. Ctrs., Inc.,* 2019 TN Wrk. Comp. App. Bd. LEXIS 22, at *11 (June 10, 2019)

Mr. Mason and Summit hired vocational experts to testify as to the extent of Mr. Mason's vocational disability. Both experts agreed that, given Dr. Watson's permanent restrictions, Mr. Mason would be limited to unskilled, sedentary work for his ankle injury alone. Given this work is essentially unavailable in Mr. Mason's job market, both found him to be totally disabled from his ankle injury. Summit did not offer any substantive contrary evidence.

Although conceding Mr. Mason's total disability, his counsel requested that permanent disability benefits be awarded under Tennessee Code Annotated section 50-6-242. This section allows for award of "extraordinary benefits" up to 275 weeks if certain criteria are met and it would be inequitable not to do so.

While Mr. Mason certainly meets the criteria, the statute specifically says these benefits may be awarded "in lieu of increased benefits …. *under section 50-6-207(3)(B)*," Section 242 makes no reference to its use in place of permanent total disability, and no authority allowing such use exists. Thus, Mr. Mason's request is denied. The Court holds that Mr. Mason is permanently and totally disabled, and his disability benefits shall be calculated under Tennessee Code Annotated section 50-6-207(4).

*Traumatic Brain Injury*

The more complicated issue is whether Mr. Mason sustained a traumatic brain injury

from the accident.  Mr. Mason clearly suffers significant cognitive deficiencies that have left him unable to live independently, require a conservator, and make him incompetent to testify.  But the severity of his condition is not a factor in determining compensability.  It remains Mr. Mason's burden to prove that his mental decline arose primarily out of his accident.  After carefully considering all the evidence, the Court holds the preponderance of evidence does not show his mental decline arose primarily out of the work accident.

To prove causation, Mr. Mason must show to a reasonable degree of medical certainty that his dementia arose primarily out of his accident in that it "contributed more than fifty percent" in causing his need for treatment.  Tenn. Code Ann. § 50-6-102(12)(A), (C).  "Reasonable degree of medical certainty" means "it is more likely than not considering all causes, as opposed to speculation or possibility."  *Id*. at -102(12)(D).  Proving all this requires expert medical opinion.  *Id*.

Mr. Mason's initial hospital records said that Mr. Mason denied hitting his head in the accident, and he did not have any external evidence of head trauma.  A head CT scan showed no acute injury other than some white matter atrophy.  The next day, Mr. Mason appeared to be very "drowsy" and confused when questioned; however, nothing in the record mentioned any abnormalities in Mr. Mason's mental state during his lengthy hospital stay after his surgery.  A few days after the accident, Mr. Mason gave his statement to the adjuster.  He unequivocally said he remembered everything about the accident and he did not strike his head.

Mr. Steele and Ms. DeLong both testified that before the accident, Mr. Mason was a very hard worker, both as a mechanic and on his farm.  He worked several hours of overtime each week during his few weeks of employment with Summit.  Significantly, however, none of Mr. Mason's co-workers from Summit or his previous employer testified as to the quality of Mr. Mason's work or whether they saw any evidence of mental decline.

Both his siblings testified they noticed nothing wrong with him before the accident. He worked and managed his affairs. However, they only saw him perhaps a few hours every two weeks or so at their parents' home.  Further, they did not see him for several weeks after the accident due to COVID restrictions, and even then, it was brief or through a window.

Further, they both said that they did not begin to notice mental problems until three months after the accident.  In that time, Mr. Mason sold his farm, made other purchases, including a home, and invested his money.  Other than Mr. Steele's lay opinion that Mr. Mason sold the farm on the low side, there was no evidence that these transactions were signs of a mental lapse. Mr. Mason apparently gave a great deal of money to his church and to a friend, but it is not clear when this behavior began to be a problem.

Mr. Mason's cognitive disfunction worsened but it was not a sudden event. It took

a year and a half to get to the point where his family felt they had no choice but place him in assisted living and assume conservatorship. Further, Ms. DeLong testified that Mr. Mason's memory loss is getting worse. The Court finds this progressive worsening significant in deciding if Mr. Mason proved a causal connection between the accident and his mental state.

As for expert opinion, Drs. Kellum and Prasad gave opinions on whether Mr. Mason's mental condition was caused by his accident. When weighing expert opinions, the Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Bass v. The Home Depot U.S.A, Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *9 (May 26, 2017).

Dr. Kellum is Mr. Mason's treating physician, which is often significant when assessing causation. However, in this case, Dr. Kellum did not begin treating Mr. Mason until ten months after his injury, and he had no more opportunity to assess Mr. Mason's pre-injury or immediate post-injury condition than Dr. Prasad. Thus, the Court does not find that Dr. Kellum's status as the treating physician is meaningful when assessing his opinion. Further, the Court finds both he and Dr. Prasad are experienced neurologists and equally qualified.

As for their opinions, Dr. Kellum knew that Mr. Mason informed the emergency room and the adjuster that he did not hit his head. No signs of head trauma were recorded at the time of the accident, and all objective tests were negative. Dr. Kellum did not know Mr. Mason's pre-accident status, other than what his siblings told him and the fact that Mr. Mason was working full-time as a mechanic before the accident. He agreed with Dr. Prasad and Dr. Foster that the cause of Mr. Mason's dementia is likely multi-factorial.

Despite all this, it remained his opinion that Mr. Mason's cognitive problems were primarily caused by the accident. However, in the end, he conceded his opinion was speculation.

Dr. Prasad, on the other hand, could not attribute Mr. Mason's mental condition to trauma from the accident. He observed that Mr. Mason could have been suffering symptoms before the accident, but he had no way of knowing without interviewing his co-workers. In the end, he believed Mr. Mason suffers from dementia that is multifactorial in cause but is not primarily due to his accident.

Finally, in Dr. Foster's neuropsychological evaluation, he determined that Mr. Mason may have hit his head in the accident. However, "the extent and severity of the patient's memory and cognitive functioning are beyond what would typically be expected with a head injury." He also observed that Mr. Mason's sleep apnea, medication, and evidence of alcohol abuse could also be contributing to his cognitive impairment, and his

condition is "likely multifactorial."

Dr. Foster is a psychologist, not a medical doctor, and his opinion cannot be considered to determine causation. However, the parties agreed that Dr. Foster's opinion could be considered, and significantly, Dr. Foster's opinion is consistent with Dr. Prasad's.

The Court gives more weight to Dr. Prasad's opinion and holds that Mr. Mason did not prove by a preponderance of the evidence that his dementia was primarily caused by his car accident. Thus, his request for medical benefits for this condition is denied.

Mr. Mason is awarded permanent total disability benefits under Tennessee Code Annotated section 50-6-207(4). These benefits shall be paid from March 14, 2022, when his permanent benefits began to accrue, until April 9, 2029, when he becomes eligible for Social Security retirement benefits. This equates to 369.14 weeks of benefits at his compensation rate of $994.00. Accrued benefits from March 14, 2022, through the date of this order shall be paid in a lump sum.

*Commutation of Benefits*

Tennessee Code Annotated section 50-6-207(4)(A)(ii)(a) provides that permanent total disability benefits "may be commuted to a lump sum to pay only the employee's attorney's fees and litigation expenses and to pay pre-injury obligations in arrears." Mr. Mason did not offer evidence of either. Section 50-6-229(a) allows commutation of attorney fees if "approved and ordered by the trial judge." Under section -226(a)(1), an attorney's fee of twenty percent of the award shall be deemed reasonable. Thus, the Court commutes 73.83 weeks of the award to a lump sum fee of $73,385.60 to be paid to Mr. Waldron.

The remaining amount of the award shall be paid periodically. To determine the amount of Mr. Mason's weekly benefits, the Court must first deduct the lump-sum payment from the total amount Mr. Mason will receive if benefits are paid until he becomes eligible for full social security retirement benefits. After dividing this amount by the number of additional weeks Mr. Mason is entitled to permanent total disability benefits, the Court holds that Summit shall pay Mr. Mason permanent total disability benefits in the amount of $743.41 per week as long as he is eligible.

*Amortization for Social Security Purposes*

Mr. Mason is 61 years old, and according to mortality tables from the United States Centers for Disease Control and Prevention, his life expectancy is 19.8 years or 237.6 months. Mr. Mason's weekly benefits have already been reduced by attorney's fees. The partial lump sum award of accrued benefits constitutes an amortized monthly benefit of $318.54, representing the maximum monthly set-off for Social Security or other disability

10

benefits under section 50-6-207(6). No representations or warranties were made to Mr. Mason concerning the Social Security Administration's right to offset benefits received under this order against his Social Security disability benefits.

IT IS, THEREFORE, ORDERED:

1. Mr. Mason is entitled to an award of permanent and total disability benefits. Summit shall pay accrued benefits in a lump sum from March 15, 2022, through the date this order becomes final. Summit shall also pay a lump-sum of $73,385.60 to Mr. Waldron as attorney's fees. The remaining award shall be paid at the weekly rate of $743.41 as long as Mr. Mason is eligible for permanent and total disability benefits.

2. Under Tennessee Code Annotated section 50-6-207(4)(a)(iv), all disability benefits shall be paid to James Steele as conservator to be spent for Mr. Mason's benefit.

3. Mr. Mason may file a motion for reimbursement of litigation expenses.

4. Dr. Geoffrey Watson shall remain Mr. Mason's treating physician for his work-related ankle injury. Summit shall pay for reasonable, necessary, and related medical treatment for this injury.

5. Summit shall pay costs of $150.00 to the Court Clerk within five business days.

6. Summit shall file with the Court Clerk a Statistical Data Form within ten business days of this order becoming final.

7. Unless appealed, this order becomes final in thirty days.

**ENTERED August 29, 2023.**

_____
**ROBERT DURHAM, JUDGE**
**Court of Workers' Compensation Claims**

**APPENDIX**

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Order Naming Conservator

11

4. Joint Pre-Compensation Hearing Statement
5. Mr. Mason's Exhibit and Witness List
6. Mr. Mason's Trial Brief
7. Summit's Trial Brief
8. Summit's Witness and Exhibit List

Exhibits:
1. Transcript of statement to adjuster
2. Agreed medical records
3. Dr. Watson's deposition
4. Dr. Kellum's deposition
5. Summit's response to requests for admissions
6. Dr. Landsberg's MIRR report
7. Summit's response to interrogatories
8. Dr. Hazlewood's deposition
9. Dr. Prasad's deposition
10. Mr. Mason's response to requests for admissions
11. Mr. Galloway's report
12. Ms. Weiss's report
13. Dr. Watson's 242 Statement

## CERTIFICATE OF SERVICE

I certify that a copy of the Order was sent as indicated on August 29, 2023.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| R. Steven Waldron | | | X | arlenesmith@wfptnlaw.com |
| Garett P. Franklyn | | | X | gpfranklyn@mijs.com |

_____
**PENNY SHRUM, Court Clerk**
WC.CourtClerk@tn.gov

12



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*